Citation Nr: 1714107 
Decision Date: 04/28/17 Archive Date: 05/05/17

DOCKET NO. 08-33 436 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Montgomery, Alabama


THE ISSUES

1. Entitlement to service connection for peripheral neuropathy of the upper extremities, to include as due to herbicide exposure and/or as secondary to the service-connected diabetes mellitus, type II.

2. Entitlement to service connection for hypertension, to include as due to herbicide exposure and/or as secondary to the service-connected diabetes mellitus, type II.

3. Entitlement to service connection for a lung disorder, to include chronic obstructive pulmonary disease (COPD) and pleural thickening and scarring, residual of pleural effusion complicating pneumonia, as due to asbestos exposure.

4. Entitlement to service connection for pericarditis. 

5. Entitlement to service connection for pulmonary sarcoidosis, to include as due to herbicide exposure.

6. Entitlement to service connection for a liver disorder, to include as due to herbicide exposure.
7. Entitlement to service connection for tendonitis.

8. Entitlement to an initial compensable rating for bilateral hearing loss.

9. Entitlement to an initial rating in excess of 20 percent for diabetes mellitus, type II with erectile dysfunction.

10. Entitlement to an initial rating in excess of 70 percent for posttraumatic stress disorder (PTSD).

11. Entitlement to special monthly compensation (SMC) based on the need for aid and attendance/housebound status.


REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

L. Barstow, Counsel



INTRODUCTION

The Veteran had active military service from January 1968 to December 1971.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from July 2007, September 2011, and April 2013 ratings decision of the VA Regional Office (RO) in Montgomery, Alabama. 

In May 2011 and April 2014, the Veteran testified at hearings conducted before a Decision Review Officer (DRO) and the undersigned, respectively. Transcripts of both hearings have been associated with the claims file.

The case was remanded in June 2014 to obtain additional treatment records; afford the Veteran VA examinations; and for the issuance of a Statement of the Case (SOC) for the issues of service connection for pulmonary sarcoidosis, tendonitis, and a liver disorder, and entitlement to SMC. As regards the issues being decided herein, review of the record indicates substantial compliance. See Stegall v. West, 11 Vet. App. 268, 271 (1998).

The Board also remanded the issues of service connection for loss of vision and chronic renal insufficiency and entitlement to a total rating based on individual employability due to service-connected disabilities (TDIU). In a December 2015 rating decision, the RO granted service connection for chronic renal insufficiency, mild non-proliferative diabetic retinopathy, and also awarded entitlement to a TDIU. Therefore, these issues are no longer on appeal.

In that same rating decision, the RO also increased the disability rating for the Veteran's PTSD to 70 percent dating back to the date of claim. As such does not constitute a full grant, the issue of a higher initial rating for PTSD remains on appeal. AB v. Brown, 6 Vet. App. 35, 39 (1993).

Following the December 2015 SOC for the issues of connection for pulmonary sarcoidosis, tendonitis, and a liver disorder, and entitlement to SMC, the Veteran filed a timely substantive appeal in January 2016. As noted by the Veteran's representative in March 2017, the Veteran's substantive appeal did not include the issues of service connection for pulmonary sarcoidosis and a liver disorder. However, the RO certified the appeal of those issues to the Board. See June 2016 VA Form 8, "Certification of Appeal." Consequently, in light of those issues being certified on appeal, the Board will take jurisdiction. See Percy v. Shinseki, 23 Vet. App. 37, 45 (2009).

With regards to the issue of service connection for a lung disorder, the Board observes that the evidence shows both COPD and pleural thickening and scarring. The scope of a disability claim includes any disability that may reasonably be encompassed by the claimant's description of the claim, reported symptoms, and the other information of record. See Clemons v. Shinseki, 23 Vet. App. 1 (2009). The Veteran's contentions, see, e.g., October 2008 substantive appeal, shows that he appears to consider his COPD and pleural thickening and scarring as encompassing one claim. Consequently, in light of Clemons, the Board has expanded the issue to include COPD.

Since the Veteran's claims were last readjudictated in December 2015, additional evidence has been added to the claims file. The Veteran specifically waived his right to have the RO consider this evidence in the first instance. 38 C.F.R. § 20.1304(c) (2016). Additionally, the evidence submitted is either cumulative or duplicative of evidence previously considered by the RO and/or is not relevant. 

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2016). 38 U.S.C.A. § 7107(a)(2) (West 2014).

The issues of service connection for peripheral neuropathy of the upper extremities, hypertension, pericarditis, and pulmonary sarcoidosis, and for entitlement to SMC being remanded are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).



FINDINGS OF FACT

1. A lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia, was not present during the Veteran's service and did not develop or worsen as a result of any incident during service, to include as due to asbestos exposure.

2. A liver disorder was not present during the Veteran's service, cirrhosis was not manifest within one year of discharge from service, and a liver disorder did not develop or worsen as a result of any incident during service, to include as due to herbicide exposure.

3. The Veteran has not had tendonitis at any time since filing his claim for compensation.

4. Audiometric testing reveals no worse than Level II hearing acuity in the right ear and Level IV hearing acuity in the left ear. 

5. The diabetes mellitus, type II, with erectile dysfunction does not require the regulation of activities.

6. The Veteran's PTSD has not resulted in total occupational and social impairment due to such symptoms as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting oneself or others; intermittent inability to perform activities of daily living; disorientation to time or place; memory loss for names of close relatives, own occupation, or own name.


CONCLUSIONS OF LAW

1. A lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia was not incurred or aggravated in service. 38 U.S.C.A. §§ 1101, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304 (2016).

2. A liver disorder was not incurred or aggravated in service. 38 U.S.C.A. §§ 1101, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304, 3.307, 3.309 (2016).

3. Tendonitis was not incurred or aggravated in service. 38 U.S.C.A. §§ 1101, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304 (2016).

4. The criteria for an initial compensable rating for bilateral hearing loss have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.159, 4.3, 4.7, 4.85, 4.86, Diagnostic Code (DC) 6100 (2016).

5. The criteria for an initial rating in excess of 20 percent for diabetes mellitus, type II with erectile dysfunction have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.159, 3.321, 4.3, 4.7, 4.119 Diagnostic Code (DC) 7913 (2016).

6. The criteria for an initial rating in excess of 70 percent for PTSD have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.159, 3.321, 4.3, 4.7, 4.130 Diagnostic Code (DC) 9411 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. VA's Duties to Notify and Assist

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his representative, if any, of any information and medical or lay evidence that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b). In accordance with 38 C.F.R. § 3.159(b)(1), proper notice must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. Such notice should also address VA's practices in assigning disability evaluations and effective dates for those evaluations. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). While the required notice should be furnished prior to the issuance of the appealed rating decision, any initial errors of notice will not be prejudicial if: 1) corrective actions (e.g., issuance of a post-adjudication notice letter containing the required information) are taken, and 2) the appeal is readjudicated (e.g., in a Supplemental Statement of the Case (SSOC)). See Mayfield v. Nicholson, 499 F.3d 1317 (Fed. Cir. 2007). 

In this case, October 2006, November 2006, September 2007, June 2011, May 2014, and September 2014 letters were provided to the Veteran in accordance with 38 C.F.R. § 3.159(b)(1). The case was last readjudicated in a December 2016 SOC and an SSOC following the September 2014 letter. In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the United States Court of Appeals for Veterans Claims (Court) held that the Veterans Law Judge (VLJ) who chairs a Board hearing fulfill two duties to comply with 38 C.F.R. § 3.103(c) (2016). These duties consist of 1) fully explaining the issues and (2) suggesting the submission of evidence that may have been overlooked. Here during the hearing the undersigned VLJ sought to identify any pertinent evidence not currently associated with the claims folder that might have been overlooked, or was outstanding that might substantiate the claim. Neither the Veteran nor his representative has asserted that VA failed to comply with 38 C.F.R. § 3.103(c)(2), and no prejudice has been identified in the conduct of the Board hearing.

VA also has a duty to assist the Veteran with the development of facts pertinent to the appeal. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159(c). This duty includes the obtaining of "relevant" records in the custody of a Federal department or agency under 38 C.F.R. § 3.159(c)(2), as well as records not in Federal custody (e.g., private medical records) under 38 C.F.R. § 3.159(c)(1). VA will also provide a medical examination if such examination is determined to be "necessary" to decide the claim. 38 C.F.R. § 3.159(c)(4).

In this case, the Veteran's service treatment records (STRs), post-service medical records, and Social Security Administration (SSA) records were obtained. Pertinent VA and fee-based examinations were obtained in February 2007, March 2007, May 2011, June 2011, October 2012, March 2015, and May 2015. 38 C.F.R. § 3.159(c)(4). The VA and fee-based examinations obtained in this case are collectively sufficient, as the examiners conducted complete examinations, recorded all findings considered relevant under the applicable law and regulations, and offered a well-supported opinions based on consideration of the full history of the disorders. The Board finds that VA's duty to assist the Veteran with respect to obtaining a VA examination concerning the claims adjudicated herein has been met. 38 C.F.R. § 3.159(c)(4). 

The Board finds that medical opinions on the questions of service connection for a liver disorder and tendonitis are not required because opinions are only necessary if the information and evidence of record does not contain sufficient competent medical evidence to decide the claim, but contains: 1) competent evidence of diagnosed disability or symptoms of disability, 2) establishes that the veteran suffered an event, injury or disease in service, or has a presumptive disease during the pertinent presumptive period, and 3) indicates that the claimed disability may be associated with the in-service event, injury, or disease, or with another service-connected disability. 38 C.F.R. § 3.159(c)(4); see McLendon v. Nicholson, 20 Vet. App. 79 (2006). In this case, as described in detail below, there is insufficient evidence establishing that any currently diagnosed liver disorder is associated with the Veteran's military service or that there is competent evidence of tendonitis. Consequently, given the standard of the regulation, the Board finds that VA did not have a duty to assist that was unmet.

A. Service Connection

Service connection may be granted for disability resulting from disease or injury incurred or aggravated during active military service. 38 U.S.C.A. § 1110. Generally, service connection requires (1) the existence of a present disability, (2) in-service incurrence or aggravation of an injury or disease, and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163 (Fed. Cir. 2004). 

Pursuant to 38 C.F.R. § 3.303(b) when a chronic condition (e.g., cirrhosis of the liver) is present, a claimant may establish the second and third elements by demonstrating continuity of symptomatology. Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). Certain chronic diseases (e.g., cirrhosis of the liver) may be also presumptively service connected if they become manifest to a degree of 10 percent or more within one year of leaving qualifying military service. 38 C.F.R. §§ 3.307(a)(3), 3.309(a) (2016). 

As to asbestos-related diseases, there are no laws or regulations specifically dealing with asbestos and service connection. However, the VA Adjudication Procedure Manual, M21-1 (M21-1), and opinions of the Court and VA General Counsel provide guidance in adjudicating these claims.

In McGinty v. Brown, the Court observed that there has been no specific statutory guidance with regard to claims for service connection for asbestosis and other asbestos-related diseases, nor has the Secretary promulgated any regulations. McGinty v. Brown, 4 Vet. App. 428, 432 (1993). However, VA has issued a circular on asbestos-related diseases, entitled Department of Veterans Benefits, Veteran's Administration, DVB Circular 21-88-8, Asbestos-Related Diseases (May 11, 1988) (DVB Circular), that provides some guidelines for considering compensation claims based on exposure to asbestos. Id. The DVB circular was subsumed verbatim as § 7.21 of Adjudication Procedure Manual, M21-1, Part VI. (This has now been reclassified in a revision to the Manual at M21- 1MR, Part IV, Subpart ii, Chapter 2, Section C). See also VAOPGCPREC 4-00 (Apr. 13, 2000).

The Manual defines asbestos as a fibrous form of silicate mineral of varied chemical composition and physical configuration, derived from serpentine and amphibole ore bodies. M21-1MR, Part IV, Subpart ii, Chapter 2, Section C, Subsection (a). Common materials that may contain asbestos are steam pipes for heating units and boilers, ceiling tiles, roofing shingles, wallboard, fire-proofing materials, and thermal insulation. Id. at Subsection (a). 

Asbestos fiber masses have a tendency to break easily into tiny dust particles that can float in the air, stick to clothes, and may be inhaled or swallowed. Id. at Subsection (b). Inhalation of asbestos fibers can produce fibrosis (the most commonly occurring of which is interstitial pulmonary fibrosis (IPF), or asbestosis), tumors, pleural effusions and fibrosis, pleural plaques, mesotheliomas of pleura and peritoneum, and cancers of the lung, bronchus, gastrointestinal tract, larynx, pharynx, and urogenital system (except the prostate). Id. at Subsection (b). 

The latent period for the development of disease due to exposure to asbestos ranges from 10 to 45 or more years (between first exposure and the development of disease). Id. at Subsection (d). The adjudication of a claim for service connection for a disability resulting from asbestos exposure should include a determination as to whether or not: (1) service records demonstrate the Veteran was exposed to asbestos during service; (2) development has been accomplished sufficient to determine whether or not the Veteran was exposed to asbestos either before or after service; and (3) a relationship exists between exposure to asbestos and the claimed disease in light of the latency and exposure factors. Id. at Subsection (h). 
"Asbestosis is pneumoconiosis due to asbestos particles; pneumoconiosis is a disease of the lungs caused by the habitual inhalation of irritant mineral or metallic particles." McGinty at 429. M21-1MR provides that inhalation of asbestos fibers can produce fibrosis and tumor, most commonly interstitial pulmonary fibrosis (asbestosis). Asbestos fibers may also produce pleural effusion and fibrosis, pleural plaques, mesotheliomas of pleura and peritoneum, lung cancer, and cancers of the gastrointestinal tract. Cancers of the larynx and pharynx, as well as the urogenital system (except the prostate) are also associated with asbestos exposure. Thus, persons with asbestos exposure have increased incidence of bronchial, lung, pharyngolaryngeal, gastrointestinal and urogenital cancer. See M21-1MR, Part IV, Subpart ii, Chapter 2, Section C.

Neither the Manual nor the DVB Circular creates a presumption of exposure to asbestos solely from a particular occupation. Rather, they are guidelines which serve to inform and educate adjudicators as to the high exposure of asbestos and the prevalence of disease found in particular occupations, and they direct that the raters develop the record; ascertain whether there is evidence of exposure before, during, or after service; and determine whether the disease is related to the putative exposure. See Dyment v. West, 13 Vet. App. 141, 146 (1999). See also Nolen v. West, 12 Vet. App. 347 (1999); VAOPGCPREC 4-2000. 

The Board notes that "Congress specifically limits entitlement for service-connected disease or injury to cases where such incidents have resulted in a disability. See 38 U.S.C.A. §§ 1110, 1131. In the absence of proof of present disability there can be no valid claim." Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992); Degmetich v. Brown, 104 F.3d 1328 (1997); Wamhoff v. Brown, 8 Vet. App. 517, 521 (1996).

Lay assertions may serve to support a claim for service connection by supporting the occurrence of lay-observable events or the presence of disability or symptoms of disability subject to lay observation. 38 U.S.C.A. § 1153(a); 38 C.F.R. § 3.303(a); Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007); see Buchanan v. Nicholson, 451 F. 3d 1331, 1336 (Fed. Cir. 2006) (addressing lay evidence as potentially competent to support presence of disability even where not corroborated by contemporaneous medical evidence). 

1. Lung Disorder, to include COPD and Pleural Thickening and Scarring

The Veteran's December 1967 enlistment examination revealed clinically normal lungs and chest; chest X-rays were negative. In his report of medical history, he denied shortness of breath; pain or pressure in chest; and chronic cough. The Veteran's November 1971 separation examination again revealed clinically normal lungs and chest; chest X-rays were within normal limits. In his report of medical history, he continued to deny shortness of breath; pain or pressure in chest; and chronic cough. The Veteran's STRs are silent for any respiratory complaints.

The Veteran's personnel records reflect that he served on board the USS John F. Kennedy during his service. The Veteran contends that he has scar tissue from asbestos exposure received while on board the USS John F. Kennedy. See, e.g., October 2006 correspondence. 

Post-service treatment records include an August 1980 record revealing that chest X-rays showed general increase in pulmonary markings, but no definite infiltrates. An April 1981 discharge summary shows that chest X-rays revealed clear lung fields. Chest X-rays in July 1981 revealed an area of pulmonary infiltration at one lung base; otherwise, the lungs were clear. Chest X-rays in May 1982 showed that the lungs and pleural spaces were clear. Lung fields were reported to be free of infiltrates in March 1992 chest X-rays. 

At a February 2007 VA examination, the Veteran reported that his respiratory problems began after surgery for pericarditis in 1981. Chest X-rays from the examination reveal right-sided volume loss with scarring and pleural thickening noted in the right mid and upper lung; COPD was also indicated. The scarring and pleural thickening were reported to be likely post inflammatory. The Veteran was diagnosed with pleural thickening/scarring that was a residual of a pleural effusion complicating pneumonia in 2001. The examiner opined that that had resulted in some restrictive lung disease. The examiner further opined that the scarring noted on the chest X-ray was most likely due to the pneumonia that the Veteran had in 2001 that was complicated by a pleural effusion. The examiner noted that chest X-rays done the year prior to his pneumonia were unremarkable for pleural or other scarring pulmonary disease. The examination report includes a copy of November 2000 X-rays showing no acute infiltrate, congestion, pneumonia, or pleural effusion. 

The examiner noted that the Veteran reported exposure to asbestos in service. They diagnosed the Veteran with asbestosis exposure, no definitive evidence of active disease. The examiner noted that the Veteran did have changes on chest X-ray, but reiterated that such were most likely due to pneumonia, with chest X-rays the year prior to the pneumonia being unremarkable for pleural or other scarring pulmonary disease. 

A July 2011 letter from a pulmonary physician shows that the Veteran was reported to have had significant exposure to asbestos in the military. The letter also shows that the Veteran had changes on his chest radiographs consistent with asbestos exposure. No details regarding such changes were provided. 
The Veteran was provided a fee-based examination in May 2015. He was diagnosed with COPD. The examiner opined that the claimed condition was less likely than not incurred in or caused by the claimed in-service injury, event, or illness. The examiner reported that there was no evidence of asbestosis on current radiographs. The examiner noted that the Veteran had a 35 year history of tobacco abuse; that was more likely the cause of COPD. The examiner reported that current fibrosis/scarring was more likely due to previous pneumonia infection he had in 2001. 

Based on a review of the evidence, the Board concludes that service connection for a lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia, is denied. Although the Veteran reported being exposed to asbestos during service, and has a current diagnosis of COPD and pleural thickening and scarring, the evidence does not show that such are related to his military service. 

The Veteran's STRs are silent for any respiratory complaints. His November 1971 separation examination showed normal lungs and chest; chest X-rays were within normal limits. The Veteran specifically denied all pertinent symptomatology in his report of medical history. As noted above, chest X-rays in 1980, 1981, 1982, 1992, and 2000 all failed to show pleural thickening and scarring and did not indicate COPD. Not until after the Veteran had pneumonia in 2001 did chest X-rays show pleural thickening and scarring, while COPD is not shown until the 2007 VA examination. None of the Veteran's treatment records contain any opinion relating his pneumonia in 2001 to his military service, to include asbestos exposure. In this case, the contemporaneous service records fail to show that the onset of any current COPD and pleural thickening and scarring began during service or are otherwise related to his military service. See Curry v. Brown, 7 Vet. App. 59, 68 (1994) (contemporaneous evidence has greater probative value than history as reported by the claimant). 

None of the Veteran's records contain any opinion relating COPD and pleural thickening and scarring as having their onset during the Veteran's military service or as being otherwise related to his military service. The only medical opinion of record addressing the COPD, that of the 2015 examiner, and the only opinions of record specifically addressing pleural thickening and scarring, those of the 2007 and 2015 examiners, show that the Veteran's COPD and pleural thickening and scarring are not related to his military service. The examiners interviewed and examined the Veteran and reviewed the evidence, yet still provided negative nexus opinions supported by rationales. As such, the Board accords these opinions great probative value. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008) (the probative value of a medical opinion comes from when there is factually accurate, fully articulated, and sound reasoning for the conclusion, not just from mere review of the claims file). They are also uncontradicted. See Colvin v. Derwinski, 1 Vet. App. 171, 175 (1991) (VA may only consider independent medical evidence to support its findings and is not permitted to base decisions on its own unsubstantiated medical conclusions.)

The Board acknowledges the 2011 letter showing that the Veteran had changes on his chest radiographs consistent with asbestos exposure. However, such letter does not attribute the pleural thickening and scarring as being due to asbestos exposure. The letter does not discuss what the reported changes were. It also does not address the fact that chest X-rays prior to the Veteran's pneumonia in 2001 did not show any pleural thickening and scarring. Consequently, the Board concludes that this letter does not support a finding of service connection. 

Here, the first evidence of any pleural thickening and scarring is not until after 2001, while COPD is not shown until 2007. The Court has indicated that normal medical findings at the time of separation from service, as well as the absence of any medical records of a diagnosis or treatment for many years after service is probative evidence against the claim. See Mense v. Derwinski, 1 Vet. App. 354, 356 (1991) (affirming Board where it found that veteran failed to account for the lengthy time period after service for which there was no clinical documentation of low back condition). See also Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000) (a prolonged period without medical complaint can be considered, along with other factors concerning a claimant's health and medical treatment during and after military service, as evidence of whether an injury or a disease was incurred in service which resulted in any chronic or persistent disability). Thus, the lack of any evidence of pertinent complaints, symptoms, or findings for three decades between the Veteran's military service and the earliest evidence of COPD and pleural thickening and scarring is itself evidence which tends to show that such did not have their onset in service or for many years thereafter.

The overall evidence of record as discussed above weighs against a finding of a lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia being associated with the Veteran's active duty, to include being due to asbestos exposure. Without an equipoise in the evidence showing an association between a lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia and the Veteran's active duty, to include asbestos exposure, service connection for a lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia is not warranted.

Lay persons are competent to provide opinions on some medical issues. See Kahana v. Shinseki, 24 Vet.App. 428, 435 (2011). As to the specific issue in this case, the etiology of a lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia, the question involved is medically complex, and accordingly the Board assigns greater weight to the VA and fee-based examiners than to the Veteran's own lay opinions. The Veteran has not been shown to possess the training, credentials, or other expertise to render an opinion that is of comparable probative value to that of the VA and fee-based examiners. See Jandreau at 1377 n.4 (lay persons not competent to diagnose cancer). 

Without competent and credible evidence of an association between a lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia and the Veteran's active duty, to include as due to asbestos exposure, service connection for a lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia is not warranted. Based on this evidentiary posture, the Board concludes that the preponderance of the evidence is against the Veteran's claim for service connection for a lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia, to include as due to asbestos exposure. As the preponderance of the evidence is against this claim, the benefit-of-the-doubt rule does not apply, and the Veteran's claim of entitlement to service connection for a lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia, to include as due to asbestos exposure, is denied. See 38 U.S.C.A § 5107 (West 2014). 

 2. Liver Disorder

The Veteran's December 1967 enlistment examination revealed all clinically normal pertinent systems. In his report of medical history, he denied liver trouble. The Veteran's November 1971 separation examination again revealed all clinically normal pertinent systems. In his report of medical history, he continued to deny liver trouble. The Veteran's STRs are silent for any liver complaints.

Post-service treatment records include a December 1980 record revealing that a liver function test suggested that the Veteran might be using alcohol to excess. A July 2007 CT scan shows that the Veteran had cirrhosis and steatosis. A May 2011 letter from one of the Veteran's treatment providers shows that he had a history of alcoholic cirrhosis. None of the Veteran's treatment records contain any opinion relating a liver disorder to his military service. 

The Veteran asserts that he has liver damage due to Agent Orange or due to alcohol. See July 2012 Statement in Support of Claim. He reported that he began drinking during service as his unit drank every day in Vietnam and that he continued to drink until 2008.

Based on a review of the evidence, the Board concludes that service connection for a liver disorder is denied. Although the Veteran was stationed in Vietnam and therefore is presumed to have been exposed to herbicide agents, and has a current diagnosis of a liver disorder, the evidence does not show that any diagnosed liver disorder is related to his military service. 

The Veteran's STRs are silent for any liver complaints. His November 1971 separation examination showed all normal pertinent systems; the Veteran specifically denied liver trouble in his report of medical history. Although liver function tests in 1980 suggested excess alcohol use, there is no evidence of any diagnosed liver disorder until 2007 when cirrhosis and steatosis was shown. None of the Veteran's treatment records contain any opinion relating a currently diagnosed liver disorder to his military service, to include being due to herbicide agent exposure. In this case, the contemporaneous service records fail to show that the onset of any current liver disorder began during service or is otherwise related to his military service. See Curry at 68. 

In this case, the evidence suggests that the Veteran's cirrhosis is due to alcohol use. As noted above, the May 2011 letter shows that the Veteran specifically had a history of alcoholic cirrhosis. Indeed, the Veteran's own contentions show that he believes that his liver disorder may be due to alcohol use. The Board observes that service connection is not possible for primary drug or alcohol abuse. While service connection is possible for such abuse if it is secondary to a service-connected disability, the evidence does not show, nor does the Veteran contend, that his alcohol use is secondary to a service-connected disability. See 38 U.S.C.A. § 105 (2014); Allen v. Principi, 237 F.3d 1368 (Fed. Cir. 2001); 38 C.F.R. §§ 3.1(m), 3.301(d) (2016). Consequently, as the evidence suggests that the Veteran's cirrhosis is due to alcohol use, and as alcohol abuse is not secondary to a service-connected disability, service connection for a liver disorder, including cirrhosis, cannot be granted. 

Here, the first evidence of any liver disorder is not until 2007. The Court has indicated that normal medical findings at the time of separation from service, as well as the absence of any medical records of a diagnosis or treatment for many years after service is probative evidence against the claim. See Mense at 356; see also Maxson at 1333. Thus, the lack of any evidence of liver complaints, symptoms, or findings for over three decades between the Veteran's military service and the earliest evidence of a liver disorder is itself evidence which tends to show that a liver disorder did not have its onset in service or for many years thereafter.

Furthermore, as the evidence does not show that the Veteran had cirrhosis manifest to a degree of 10 percent or more within one year of discharge, the Board finds that service connection on a presumptive basis is not warranted. 

Similarly, the Board also finds that the evidence does not establish a continuity of symptomatology and therefore a nexus under Walker, as cirrhosis is a chronic disease as per 38 C.F.R. § 3.309. As already discussed above, a liver function test in 1980 did not suggest a liver disorder. In light of the normal separation examination and denial of liver trouble at separation from service, the contemporaneous evidence of record weighs against a finding of a continuity of symptomatology. 

The overall evidence of record as discussed above weighs against a finding of a liver disorder being associated with the Veteran's active duty, to include as due to herbicide exposure. Without an equipoise in the evidence showing an association between a liver disorder and the Veteran's active duty, to include as due to herbicide exposure, service connection for a liver disorder is not warranted.

Lay persons are competent to provide opinions on some medical issues. See Kahana at 435. As to the specific issue in this case, the etiology of a liver disorder, the question involved is medically complex, and accordingly the Board assigns greater weight to the Veteran's treatment providers than to the Veteran's own lay opinions. The Veteran has not been shown to possess the training, credentials, or other expertise to render an opinion that is of comparable probative value to that of a medical professional. See Jandreau at 1377 n.4. 

Without competent and credible evidence of an association between a liver disorder and the Veteran's active duty, to include as due to herbicide exposure, service connection for a liver disorder is not warranted. Based on this evidentiary posture, the Board concludes that the preponderance of the evidence is against the Veteran's claim for service connection for a liver disorder, to include as due to herbicide exposure. As the preponderance of the evidence is against this claim, the benefit-of-the-doubt rule does not apply, and the Veteran's claim of entitlement to service connection for a liver disorder, to include as due to herbicide exposure is denied. See 38 U.S.C.A § 5107.

 3. Tendonitis

The Veteran's December 1967 enlistment examination revealed all clinically normal pertinent systems with the exception of the upper extremities; part of one of the Veteran's fingers was noted as being absent. In his report of medical history, he denied arthritis or rheumatism; bone, joint or other deformity; painful or "trick" shoulder or elbow; recurrent back pain; and "trick" or locked knee. The Veteran's November 1971 separation examination revealed clinically normal pertinent systems. In his report of medical history, he continued to deny arthritis or rheumatism; bone, joint or other deformity; painful or "trick" shoulder or elbow; recurrent back pain; and "trick" or locked knee. The Veteran's STRs are silent for any complaints relating to tendonitis.

Post-service treatment records do not reflect any diagnosis of tendonitis. There is a diagnosis of subdeltoid/acromioclavicular bursitis, see, e.g., February 2012 past medical history list, but no diagnosis of tendonitis. The Veteran has not made any statements indicating which part of the body is reportedly affected by tendonitis. In his January 2016 substantive appeal, the Veteran reported that although he was denied tendonitis, he applied for tinnitus, not tendonitis. The Veteran is currently service-connected for tinnitus. 

Based on a review of the evidence, the Board concludes that service connection for tendonitis is denied. Tendonitis has not been shown at any time since the claim for service connection. 

In this case, none of the Veteran's treatment records have shown a current diagnosis of tendonitis. The Veteran has not reported what part of the body is affected by tendonitis; indeed, the Veteran's own substantive appeal shows that he meant to refer to tinnitus in his claim as opposed to tendonitis. 

The existence of a current disability is the cornerstone of a claim for VA disability compensation. 38 U.S.C.A. §§ 1110, 1131. See also Degmetich at 1332 (holding that interpretation of sections 1110 and 1131 of the statute as requiring the existence of a present disability for VA compensation purposes cannot be considered arbitrary). In other words, the evidence must show that, at some point during the appeal period, the Veteran has the disability for which benefits are being claimed. Here, for the reasons set forth above, the overall evidence of record weighs against a finding of tendonitis at any time during the appeal period. 

Lay persons are competent to provide opinions on some medical issues. See Kahana at 435. As to the specific issue in this case, the diagnosis of tendonitis, the question involved is medically complex, and accordingly the Board assigns greater weight to the treatment records failing to show such diagnosis than to the Veteran's own lay opinions. The Veteran has not been shown to possess the training, credentials, or other expertise to render a diagnosis that is of comparable probative value to that of his treatment providers. See Jandreau at 1377 n.4. 

At no time since the Veteran filed his claim for service connection for tendonitis in October 2011 has such disability been shown. See McClain v. Nicholson, 21 Vet. App. 319 (2007) (stipulating that a service connection claim may be granted if a diagnosis of a chronic disability was made during the pendency of the appeal, even if the most recent medical evidence suggests that the disability resolved). Based on this evidentiary posture, the Board concludes that the preponderance of the evidence is against the Veteran's claim for service connection for tendonitis. As the preponderance of the evidence is against this claim, the benefit-of-the-doubt rule does not apply, and the Veteran's claim for service connection for tendonitis is denied. See 38 U.S.C.A § 5107.

B. Initial Ratings

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities. 38 C.F.R. Part 4. The Board determines the extent to which a veteran's service-connected disability adversely affects his ability to function under the ordinary conditions of daily life, and the assigned rating is based, as far as practicable, upon the average impairment of earning capacity in civil occupations. 38 U.S.C.A. § 1155; 38 C.F.R. §§ 4.1, 4.10. Where there is a question as to which of two ratings should be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. 

A distinction must be made between a veteran's dissatisfaction with original ratings and dissatisfaction with determinations on later filed claims for increased ratings. See Fenderson v. West, 12 Vet. App. 119, 125-26 (1999). 

 1. Bilateral Hearing Loss 

In this case, the Veteran's disability is evaluated as zero percent or noncompensably disabling. Disability evaluations for hearing impairment are derived by a mechanical application of the rating schedule to the numeric designations assigned after audiometric evaluations are rendered. See Lendenmann v. Principi, 3 Vet. App. 345, 349 (1992). Examinations are conducted using the controlled speech discrimination tests (Maryland CNC) together with the results of the puretone audiometry test. See 38 C.F.R. § 4.85.

The results are then analyzed using tables contained in 38 C.F.R. § 4.85, DC 6100. "Puretone threshold average," as used in Tables VI and VIa, is the sum of the puretone thresholds at 1000, 2000, 3000 and 4000 Hertz, divided by four. This average is used in all cases to determine the Roman numeral designation for hearing impairment from Table VI or VIa. The appropriate rating is then determined by finding the intersection point for the two Roman numeral designations using Table VII.

For exceptional patterns of hearing impairment, 38 C.F.R. § 4.86 provides as follows: (a) When the puretone threshold at each of the four specified frequencies (1000, 2000, 3000, and 4000 Hertz ) is 55 decibels or more, the rating specialist will determine the Roman numeral designation for hearing impairment from either Table VI or Table VIa, whichever results in the higher numeral. Each ear will be evaluated separately. (b) When the puretone threshold is 30 decibels or less at 1000 Hertz, and 70 decibels or more at 2000 Hertz, the rating specialist will determine the Roman numeral designation for hearing impairment from either Table VI or Table VIa, whichever results in the higher numeral. That numeral will then be elevated to the next higher Roman numeral. Each ear will be evaluated separately.

A November 2006 audiogram shows the Veteran's puretone thresholds, but his speech recognition scores were not in accordance with the Maryland CNC Test. As an exceptional pattern of hearing loss was not shown, this audiogram is not sufficient for rating purposes. 

The average puretone hearing loss on a VA examination in March 2007 was 38 decibels in the right ear and 46 decibels in the left ear. Speech recognition scores using the Maryland CNC word lists were 100 percent in the right ear and 96 percent in the left ear. No exceptional pattern of hearing loss was shown. The Veteran reported difficulty understanding in the presence of competing noise. Pursuant to 38 C.F.R. 4.85, Table VI with regards to the Veteran's right ear, his puretone threshold average and speech discrimination score received a numeric designation of Level I. Turning to the Veteran's left ear, the foregoing puretone threshold average and speech discrimination score also received a numeric designation of Level I. Applying the numeric designations to 38 C.F.R. 4.85, Table VII, the Veteran was entitled to a zero percent rating under DC 6100. Therefore, an initial compensable rating is not warranted based on these results. 

The average puretone hearing loss on a VA examination in June 2011 was 36 decibels in the right ear and 55 decibels in the left ear. Speech recognition scores using the Maryland CNC word lists were 100 percent in the right ear and 94 percent in the left. No exceptional pattern of hearing loss was shown. Pursuant to 38 C.F.R. 4.85, Table VI with regards to the Veteran's right ear, his puretone threshold average and speech discrimination score received a numeric designation of Level I. Turning to the Veteran's left ear, the foregoing puretone threshold average and speech discrimination score also received a numeric designation of Level I. Applying the numeric designations to 38 C.F.R. 4.85, Table VII, the Veteran was entitled to a zero percent rating under DC 6100. Therefore, an initial compensable rating is not warranted based on these results. 
The average puretone hearing loss on a VA examination in October 2012 was 40 decibels in the right ear and 56 decibels in the left ear. Speech recognition scores using the Maryland CNC word lists were 88 percent bilaterally. No exceptional pattern of hearing loss was shown. The Veteran reported difficulty hearing in most all listening situations. Pursuant to 38 C.F.R. 4.85, Table VI with regards to the Veteran's right ear, his puretone threshold average and speech discrimination score received a numeric designation of Level II. Turning to the Veteran's left ear, the foregoing puretone threshold average and speech discrimination score also received a numeric designation of Level II. Applying the numeric designations to 38 C.F.R. 4.85, Table VII, the Veteran was entitled to a zero percent rating under DC 6100. Therefore, an initial compensable rating is not warranted based on these results. 
85

At his April 2014 hearing, the Veteran testified his treatment providers wanted to give him hearing aids, but that he was not "ready for that yet." April 2014 Hearing Transcript (T.) at 9. He reported that his used his dog for hearing purposes. Id. The Veteran testified that his hearing was impacted in certain cases if there was a lot of noise going on. Id. He testified that he could not hear high frequencies. Id. 

The average puretone hearing loss on a VA examination in May 2015 was 38 decibels in the right ear and 55 decibels in the left ear. Speech recognition scores using the Maryland CNC word lists were 96 percent bilaterally. An exceptional pattern of hearing loss in the left ear was shown as his hearing acuity was 25 decibels at 1000 Hertz and 70 decibels at 2000 Hertz. The Veteran reported that he could not hear high frequencies. Pursuant to 38 C.F.R. 4.85, Table VI with regards to the Veteran's right ear, his puretone threshold average and speech discrimination score received a numeric designation of Level I. Turning to the Veteran's left ear, pursuant to 38 C.F.R. 4.85, Table VI, the foregoing puretone threshold average and speech discrimination score also received a numeric designation of Level I. As the Veteran had an exceptional pattern of hearing loss, then pursuant to 38 C.F.R. 4.85, Table VIa, his puretone threshold average received a numeric designation of Level III. Due to this exceptional pattern of hearing impairment, as 38 C.F.R. § 4.86 provides for the higher of the two Roman numerals being elevated to the next higher Roman numeral, then a numeric designation of Level IV is warranted for the left ear. Applying the numeric designations to 38 C.F.R. 4.85, Table VII, the Veteran was entitled to a zero percent rating under DC 6100. Therefore, an initial compensable rating is not warranted based on these results. 

There are no treatment records showing the Veteran's hearing acuity that are sufficient for rating purposes. 

Here, since the award of service connection, the Veteran has been assigned a zero percent or noncompensable rating. For the reasons discussed above, there are no evaluations showing that an initial compensable rating is warranted at any time during this appeal. Disability evaluations for hearing impairment are derived by a mechanical application of the rating schedule to the numeric designations assigned after audiometric evaluations are rendered. See Lendenmann at 349. The Board has applied the results of the examinations during this appeal to 38 C.F.R. 4.85, Table VII, and a compensable rating is not warranted as shown above. Therefore, his initial rating claim is denied.

The above determination is based upon consideration of applicable rating provisions. In Martinak v. Nicholson, 21 Vet. App. 447, 455-56 (2007), the Court noted that VA had revised its hearing examination worksheets to include the effect of the Veteran's hearing loss disability on occupational functioning and daily activities. See Revised Disability Examination Worksheets, Fast Letter 07-10 (Dep't of Veterans Affairs Veterans Apr. 24, 2007); see also 38 C.F.R. § 4.10 (2016). The Court also noted, however, that, even if an audiologist's description of the functional effects of the Veteran's hearing loss disability was somehow defective, the Veteran bears the burden of demonstrating any prejudice caused by a deficiency in the examination.

In this case, the Veteran reported functional impairment at the 2007, 2012, and 2015 examinations. Those examination reports clearly reflect the Veteran's report of his bilateral hearing loss and resulting impairment. As those examinations addressed the functional impairment of the Veteran's bilateral hearing loss, and as the Veteran has not demonstrated any prejudice caused by a deficiency in any examination, the Board reiterates that the evidence does not support a finding of an initial compensable rating at any time during this appeal. The evidence does not show that the Veteran's bilateral hearing loss has resulted in marked interference with employment or activities of daily life. 

Accordingly, and based on this evidentiary posture, the Board concludes that the totality of the evidence of record has not shown that the Veteran's bilateral hearing loss warrants an initial compensable rating at any time during this appeal. The Board finds, therefore, that the evidence of record does not support the criteria required for an increased schedular rating at any time during this appeal. 

 2. Diabetes Mellitus, Type II with Erectile Dysfunction

The Veteran's diabetes mellitus, type II is rated as 20 percent disabling under DC 7913, which evaluates impairment from diabetes mellitus. 

Specifically, pursuant to DC 7913, diabetes mellitus requiring insulin and restricted diet, or; oral hypoglycemic agent and restricted diet is assigned a 20 percent disability rating. 38 C.F.R. § 4.119, DC 7913 (2016).

Diabetes mellitus requiring insulin, restricted diet, and regulation of activities is assigned a 40 percent disability rating. Id.

Diabetes mellitus requiring insulin, restricted diet, and regulation of activities with episodes of ketoacidosis or hypoglycemic reactions requiring one or two hospitalizations per year or twice a month visits to a diabetic care provider, plus complications that would not be compensable if separately evaluated, is assigned a 60 percent disability rating. Id.

Diabetes mellitus requiring more than one daily injection of insulin, restricted diet, and regulation of activities (avoidance of strenuous occupational and recreational activities) with episodes of ketoacidosis or hypoglycemic reactions requiring at least three hospitalizations per year or weekly visits to a diabetic care provider, plus either progressive loss of weight and strength or complications that would be compensable if separately evaluated, is assigned a 100 percent disability rating. Id.
In addition, the regulations stipulate that compensable complications of diabetes are to be evaluated separately, with noncompensable complications to be considered as part of the diabetic process under DC 7913. Id at Note (1). 

As discussed in the Introduction, the Veteran has been granted service connection for loss of vision and chronic renal insufficiency; both are secondary to his diabetes mellitus, type II. The issues of service connection for peripheral neuropathy of the upper extremities and hypertension are discussed in the remand that follows. Consequently, in rating the Veteran's diabetes mellitus, type II, the Board will consider complications other than vision, kidney, peripheral neuropathy, and hypertension disorders. 

The Board notes that "regulation of activities" is defined in DC 7913 as "avoidance of strenuous occupational and recreational activities." Id. In Camacho v. Nicholson, 21 Vet. App. 360, 363-364 (2007), the Court held that medical evidence is required to show that occupational and recreational activities have been restricted. 

The Veteran was provided a VA examination in February 2007. He reported that his diabetes was treated with medication. There was no history of hospitalization or surgery associated with diabetes; pancreatic trauma or neoplasm; episodes of hypoglycemic reactions or ketoacidosis; instructions to follow a restricted or special diet; restriction in ability to perform strenuous activities; symptoms of diabetic related peripheral vascular disease in the lower extremities; neurovascular symptoms; skin symptoms; gastrointestinal symptoms; or genitourinary symptoms. Examination revealed no diabetic skin abnormalities. The Veteran was not currently employed. His diabetes had no effect on sports, recreation, feeding, bathing, and toileting; a mild effect on chores, traveling, and dressing; a moderate effect on shopping and exercise; and a severe effect on driving. 

At a VA examination in June 2011, the Veteran denied any episodes of hypoglycemia or ketoacidosis. He reported having a special diet and visits for diabetic medical care every six to 12 months. His current treatment was medication. There was no history of hospitalization or surgery associated with diabetes; pancreatic trauma; diabetes related neoplasm; episodes of hypoglycemic reactions or ketoacidosis; restriction in ability to perform strenuous activities; symptoms of diabetic related peripheral vascular disease in the lower extremities; neurovascular disease; skin disorders; or gastrointestinal disorders. There was no treatment of erectile dysfunction. An examination revealed no diabetic skin abnormalities. The Veteran was not currently employed. The genitourinary portion of the examination did not show penile deformity with loss of erectile power. 

At his April 2014 hearing, the Veteran asserted that he had been in a diabetic coma in 2008. T. at 4. He testified that a higher rating was warranted due to his kidney problems. Id. at 5. The Veteran testified that his health in general kept him from doing a lot of exercise. Id. at 15. 

A VA examination for his erectile dysfunction in March 2015 showed that physical examination was normal. 

The Veteran was provided a VA examination in May 2015. He reported being treated with restricted diet and medication. He did not require regulation of activities as part of medical management of his diabetes mellitus. The Veteran saw his diabetic care provider less than two times per month. He had had zero episodes of ketoacidosis or hypoglycemia requiring hospitalization over the past 12 months. No complications other than those already service-connected or claimed on appeal were reported. There was no evidence of rashes or lesions. The examiner reported that the Veteran's diabetes mellitus and associated complications impacted his ability to work. The examiner noted that the Veteran's diabetes had led to stage IV renal failure, pending starting dialysis. The examiner noted that the Veteran mostly did not work due to liver disease, COPD and chronic kidney disease. 

The Veteran's treatment records throughout this appeal have not shown that his diabetes mellitus, type II requires the regulation of activities. They also have not shown compensable complications other than those already service-connected or on appeal. 

Based on a review of the evidence, the Board concludes that an initial rating in excess of 20 percent is not warranted at any time since the award of service connection. The next higher rating of 40 percent, as well as the 60 and 100 percent ratings, all contemplate the regulation of activities. In this case, the examinations and treatment records all fail to show that the Veteran is required to regulate his activities as a result of his diabetes mellitus, type II. The Veteran's contentions throughout this appeal have not shown that his diabetes mellitus, type II requires the regulation of activities for treatment. As discussed above, he testified that his health in general kept from doing a lot of exercise. Additionally, while the Veteran testified that a higher rating was warranted based on kidney problems, since that hearing, service connection for chronic renal insufficiency has been granted. Consequently, as the ratings in excess of 20 percent all contemplate the regulation of activities, which has not been shown, the Board finds that a rating in excess of 20 percent is not warranted. 

Additionally, the evidence does not show other compensable complications besides the already service-connected erectile dysfunction, loss of vision and chronic renal insufficiency. For the reasons discussed below, the Board is remanding the claims of service connection for peripheral neuropathy of the upper extremities and hypertension. The examinations as well as the Veteran's treatment records in this case have not shown other complications. As regards the Veteran's erectile dysfunction being rated as part of the diabetic process, the evidence fails to show that a compensable rating is warranted. A compensable rating under the applicable diagnostic code requires deformity of penis with loss of erectile power. 38 C.F.R. § 4.115b, DC 7520 (2016). Examinations and treatment records have not shown deformity, nor has the Veteran contended such. Therefore, in light of the above, the Board finds that there are no separate compensable complications of diabetes to be evaluated separately at this time and no other noncompensable complications to be considered as part of the diabetic process under DC 7913. 

For these reasons, the Board finds that the criteria for an initial rating in excess of 20 percent have not been met.


 3. PTSD 

The Veteran's PTSD is rated as 70 percent disabling under 38 C.F.R. § 4.130, DC 9411, which evaluates impairment from PTSD. 

Specifically, pursuant to DC 9411, a 70 percent evaluation is warranted if the evidence establishes there is occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships. 38 C.F.R. § 4.130, DC 9411 (2016). 

A 100 percent evaluation is warranted if the evidence establishes there is total occupational and social impairment due to such symptoms as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting oneself or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. Id. 

When determining the appropriate disability evaluation to assign, the Board's primary consideration is a veteran's symptoms, but it must also make findings as to how those symptoms impact a veteran's occupational and social impairment. Vazquez-Claudio v. Shinseki, 713 F.3d 112 (Fed. Cir. 2013); Mauerhan v. Principi, 16 Vet. App. 436, (2002). Because the use of the term "such as" in the rating criteria demonstrates that the symptoms after that phrase are not intended to constitute an exhaustive list, the Board need not find the presence of all, most, or even some, of the enumerated symptoms to award a specific rating. Id. at 442; see also Sellers v. Principi, 372 F.3d 1318 (Fed. Cir. 2004). Nevertheless, all ratings in the general rating formula are also associated with objectively observable symptomatology and the plain language of the regulation makes it clear that the veteran's impairment must be "due to" those symptoms, a veteran may only qualify for a given disability rating by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration. Vazquez-Claudio, 713 F.3d at 118. 

When evaluating a mental disorder, the rating agency shall consider the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the veteran's capacity for adjustment during periods of remission. The rating agency shall assign an evaluation based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126(a) (2016). When evaluating the level of disability from a mental disorder, the rating agency will consider the extent of social impairment, but shall not assign an evaluation solely on the basis of social impairment. 38 C.F.R. § 4.126(b).

The Global Assessment of Functioning (GAF) is a scale reflecting the psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. See Carpenter v. Brown, 8 Vet. App. 240 (1995); see also Richard v. Brown, 9 Vet. App. 266, 267 (1996) (citing DSM-IV).

A GAF score of 61 to 70 is indicative of some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within household) but generally functioning pretty well, has some meaningful interpersonal relationships).

A GAF score of 51 to 60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers). 

A GAF score of 41 to 50 is indicative of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).
A GAF score of 31 to 40 is indicative of some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work).

A GAF score of 21 to 30 is indicative of behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

A January 2006 psychiatric evaluation in connection with the Veteran's claim for SSA benefits shows that the Veteran lived with his common-law spouse. He reported not belonging to any social organizations; not going out to clubs or attending church; and not visiting with friends or family. He was oriented to person, time, place, and circumstance. Thought processes were rational and coherent in form, proceeding at normal pace. He was in no acute distress, evidencing no sensory deficits. Concentration and short-term memory were fair. He described his mood as anxious and focused on concern about his finances and health. He described himself as depressed, somewhat ruminative. He felt his affect was generally appropriate to circumstance, but he was sometimes irritated or frustrated. He denied phobia, obsession or compulsion. He denied misperceptions of reality, hallucinations, delusions, and ideas of reference. The examiner opined that the Veteran's ability to relate to others was restricted by his depressed mood. They opined that his ability to function and provide care for himself appeared to be intact. 

A March 2007 psychiatric evaluation also in connection with the Veteran's claim for SSA benefits shows that the Veteran was casually dressed and adequately groomed. He was oriented to person, time, place, and circumstance. Speech was directed primarily towards his physical and emotional problems; the examiner found no evidence of difficulty with communication. The Veteran's attention, concentration, and memory function were within normal limits. Thought processes were logical, coherent, and without evidence of interference from a psychotic process. Thought content was essentially responsive to questioning. The Veteran reported that he was "not in too good a mood." Affect was appropriate. He reported that he talked on the telephone and shopped. He stated that he was not involved in any regular visitation and attended no group gatherings. A GAF score of 70 was assigned. 

The Veteran was provided a VA examination in March 2007. He reported symptoms of depression with feeling down and sad, angry, anergia, anhedonia, decreased appetite, and disturbed sleep. He reported that his symptoms were daily and had worsened over time. The Veteran reported being married to his third wife for five years. He reported his current relationship as "pretty good, real good in fact." The Veteran reported being estranged from his two children for many years, but they were becoming closer. He reported having close contact with a friend from service and having other friends that he spoke to on the phone twice a month. There was no history of suicide attempts or violence/assaultiveness. The examiner opined that the Veteran was mildly impaired with respect to his psychosocial functioning. 

Examination revealed unremarkable motor activity and speech. The Veteran was cooperative and irritable. Affect was constricted; mood was agitated, dysphoric; orientation was intact to person, time, and place; thought process was unremarkable; and thought content was preoccupation with one or two topics. The Veteran had paranoid delusions that were not persistent. He understood the outcome of his behavior and that he had a problem. He had sleep impairment; he was not rested when he awakened. There were no hallucinations; inappropriate behavior; obsessive/ritualistic behavior; or panic attacks. The Veteran had had homicidal ideation in the past when angry, but no report of current homicidal ideation, intent, or plan. He had suicidal ideation on occasion, but no report of current suicidal ideation, intent, or plan. Impulse control was fair and there were no episodes of violence. The Veteran reported that he was easily irritated and would tell people that he wanted to go out into the parking lot to settle a dispute. He was able to maintain minimum personal hygiene. 

The Veteran's disability had no effect on toileting, grooming, self-feeding, bathing, dressing/undressing, or driving; a slight effect on chores; a moderate effect on traveling; and a severe effect on shopping. Remote memory was normal; recent and immediate memory were mildly impaired. The Veteran had difficulty recalling conversations. The Veteran was not employed because of his physical condition. A GAF score of 53 was assigned. The examiner opined that the Veteran's depression might be contributing to his irritability and decreased interest in socialization.

A November 2009 letter from the Veteran's treatment provider shows that he had poor sleep, frequent wakefulness, cold sweats, and anxiety. The Veteran also reported feelings of low frustration tolerance and hopelessness. An April 2011 letter from the same provider shows that the Veteran had anxiety, low frustration tolerance, and irritability. The Veteran was noted to have been more depressed; sleeping poorly due to nightmares; waking up in cold sweats; and feeling quite anxious. The Veteran was reported as having affective instability and periods of hopelessness; however, he denied any harmful ideation, plan, or intent.

The Veteran was afforded a VA examination in May 2011. He reported having a good relationship with his wife. He also reported being estranged from his children for many years, but had a fair relationship with them presently. The Veteran had very few friends; he occasionally spoke on the phone to some old military buddies. There was no history of suicide attempts or violence/assaultiveness. The Veteran's psychosocial functioning was moderately impaired. He tended to isolate and had few social or leisure involvements. He had a fairly good relationship with his current spouse.

Examination revealed that he was clean, neatly groomed, and casually dressed. Psychomotor activity was unremarkable; speech was spontaneous and clear; attitude was cooperative and relaxed; affect was appropriate; mood was dysphoric; attention was intact; orientation was intact to person, time, and place; thought process was rambling; and though content was unremarkable. The Veteran had no delusions. He understood the outcome of his behavior and that he had a problem. He had sleep impairment with nightmares at night and during the day. There were no hallucinations; inappropriate behavior; obsessive/ritualistic behavior; panic attacks; or homicidal thoughts. The Veteran interpreted proverbs appropriately. He had occasional suicidal thoughts, but no plan or intent. Impulse control was good and there were no episodes of violence. The Veteran was able to maintain minimum personal hygiene. There was no problem with activities of daily living. Remote and recent memory were mildly impaired and immediate memory was normal. The Veteran was not employed. 

A GAF score of 65 was assigned. The examiner noted that the Veteran frequently had nightmares during which he struck his wife; she was uncomfortable sleeping with him as a result. The examiner commented that irritability also detracted from the quality of the marital relationship. The Veteran reported few meaningful interpersonal relationships due to detachment from others. He reported avoiding crowds due to hypervigilance and that he tended to isolate at home, thus avoiding recreational pursuits. The examiner opined that there was no total occupational and social impairment due to PTSD signs and symptoms. 

A November 2013 letter from the Veteran's treatment provider reveals that he had nightmares often upon waking from sleep, anxiety, low frustration tolerance, and irritability. 

At a VA examination in May 2015, the examiner reported that the Veteran's PTSD resulted in occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood. The Veteran was not currently married; he had no significant other and lived by himself. He reported remaining close with one of his children. The Veteran denied any current suicidal/homicidal intent, ideation, or plans. His symptoms included depressed mood; anxiety; suspiciousness; panic attacks more than once a week; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; chronic sleep impairment; mild memory loss, such as forgetting names, directions or recent events; flattened affect; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; and obsessional rituals which interfere with routine activities. The examiner noted that the Veteran was appropriately dressed and groomed. His affect was flat, and his mood was depressed. The Veteran had other symptoms of nightmares; problems getting to and staying asleep; being active in sleep; self-isolating; not liking/tolerating crowds; being easily irritated; having no leisure or social activity; being easily startled; and panic. The examiner opined that the Veteran's PTSD symptoms were of such severity that his ability to successfully work in a traditional work environment was significantly compromised. 

The Veteran's treatment records during this appeal have shown symptoms consistent to those reported at the examinations. His GAF scores ranged from 30 to 55. 

Based on a review of the evidence, the Board concludes that an initial rating in excess of 70 percent is not warranted at any time since the award of service connection. The evidence does not indicate total occupational and social impairment. No medical professional has provided any such opinion indicating that the Veteran's psychiatric disability results in total occupational and social impairment. The Veteran was married during this appeal. Although the evidence shows that he and his wife got divorced, the Veteran was reported to have relationships with his children. While he isolates, considering that he maintains relationships with his children, and has friends with which he speaks to by phone, the Board is unable to conclude that the Veteran has total social impairment. To the extent that the Veteran's PTSD impacts his occupational impairment, the Board observes that the Veteran is in receipt of a TDIU, due partly to his PTSD. The assigned 70 percent rating specifically contemplates the symptoms shown during this appeal. The overall evidence of record does not indicate that the Veteran's psychiatric symptomatology results in total occupational and social impairment such that a 100 percent rating is warranted. 

In this case, the actual symptoms shown in his treatment records and during the examinations do not include such symptoms as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting oneself or others; intermittent inability to perform activities of daily living; disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. 

The Board acknowledges that the list of symptoms supporting a 100 percent rating is not exhaustive. See Mauerhan at 442-43. However, even when taking into account the actual symptoms shown during this appeal, while the Veteran does have occupational and social impairment, total impairment has not been shown for the reasons set forth above. The 2011 examiner specifically opined that the Veteran did not have total occupational and social impairment, while the 2015 examiner opined that the Veteran's disability resulted in occupational and social impairment with deficiencies in most areas; the same level of impairment warranting the currently assigned 70 percent rating. As the examiners interviewed and examined the Veteran, the Board accords these opinions great probative value. They are also uncontradicted. 

The Board notes that the reported GAF of 30 is indicative of behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment. The Board also notes that, while important, the GAF scores assigned in a case are not dispositive of the evaluation and must be considered in light of the actual symptoms of the Veteran's disorder. See 38 C.F.R. § 4.126(a). In considering the actual symptoms shown, the Board concludes that the highest rating of 100 percent is not warranted. 

For these reasons, the Board finds that the criteria for an initial rating in excess of 70 percent have not been met.

 4. Extraschedular Consideration

The Board also finds that referral for extraschedular ratings is not warranted. The Rating Schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations. Generally, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the disability. 38 C.F.R. § 4.1. In exceptional cases where evaluations provided by the Rating Schedule are found to be inadequate, an extraschedular evaluation may be assigned that is commensurate with the Veteran's average earning capacity impairment due to the service-connected disorders. 38 C.F.R. § 3.321(b)(1).

The Court has provided a three-pronged test for determining whether extraschedular consideration is warranted. Thun v. Peake, 22 Vet App 111, 114 (2008), aff'd sub. nom. Thun v. Shinseki, 573 F.3d 1366 (Fed. Cir. 2009). First, as a threshold factor, there must be a finding that the evidence of record presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Id. In this regard, the Board must compare the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the Rating Schedule for that disability. If the rating criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the Rating Schedule, in which case the assigned schedular evaluation is adequate and no referral is required. Id. Second, if the schedular criteria are found to be inadequate to evaluate the claimant's disability, the Board must determine whether the exceptional disability exhibits other related factors such as marked interference with employment or frequent periods of hospitalization. Id. If so, then under the third step of the inquiry the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service for a determination of whether, to accord justice, the claimant's disability picture requires the assignment of an extraschedular rating. Id.

The question of an extraschedular rating is a component of a claim for an increased rating. See Bagwell v. Brown, 9 Vet. App. 337, 339 (1996). And although the Board may not assign an extraschedular rating in the first instance, it must specifically adjudicate whether to refer a case for extraschedular evaluation when the issue either is raised by the claimant or reasonably raised by the evidence of record. Barringer v. Peake, 22 Vet. App. 242 (2008).

Here, though, no such special referral or consideration is warranted since the regular schedular standards applied in this case adequately describe and provide for the Veteran's bilateral hearing loss, diabetes mellitus, type II with erectile dysfunction, and psychiatric symptoms and consequent disability levels. Marked interference with employment beyond that contemplated by the schedular criteria has not been shown. 38 C.F.R. §§ 4.1. The record does not reflect a disability picture that is so exceptional or unusual that the normal provisions of the Rating Schedule would not adequately compensate him for his service-connected disabilities. The Board has considered the Veteran's contentions throughout this appeal, as well as his treatment records and examinations. However, the Veteran's own statements and the evidence does not suggest that the bilateral hearing loss, diabetes mellitus, type II with erectile dysfunction, and PTSD symptoms result in impairment not contemplated by the schedular criteria. Ordinarily, the VA Rating Schedule will apply unless there are exceptional or unusual factors that would render application of this schedule impractical. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993); Fanning v. Brown, 4 Vet. App. 225, 229 (1993). As such, special referral for extraschedular consideration is not warranted in this instance. 

Next, the Board notes that under Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual condition fails to capture all the service-connected disabilities experienced. However, this is not an exceptional circumstance in which extraschedular consideration may be required to compensate the Veteran for his disabilities that can be attributed only to the combined effect of multiple service-connected conditions. Thus, no basis for referring the case for an extraschedular consideration is presented in this case.

Moreover, as the Veteran is in receipt of a total disability rating based upon individual unemployability (TDIU), the Board need not address whether the issue of entitlement to a TDIU has been raised by the record. 






ORDER

Entitlement to service connection for a lung disorder, to include COPD and pleural thickening and scarring, residual of pleural effusion complicating pneumonia, to include as due to asbestos exposure, is denied.

Entitlement to service connection for a liver disorder, to include as due to herbicide exposure, is denied.

Entitlement to service connection for tendonitis is denied.

Entitlement to an initial compensable rating for bilateral hearing loss is denied.

Entitlement to an initial rating in excess of 20 percent for diabetes mellitus, type II with erectile dysfunction is denied.

Entitlement to an initial rating in excess of 70 percent for PTSD is denied.


REMAND

Regrettably, a remand is necessary for the issues of service connection for peripheral neuropathy of the upper extremities, hypertension, pericarditis, and pulmonary sarcoidosis and entitlement to SMC. Regarding the peripheral neuropathy and hypertension, the Board's June 2014 remand directed that an examination be provided for these claims. The examiner was requested to opine as to whether the disorders were secondary to diabetes mellitus, type II. The Veteran was provided a fee-based examination in May 2015; the examiner opined that the peripheral neuropathy and hypertension were less likely than not proximately due to or the result of the service-connected diabetes mellitus, type II. However, no opinions regarding whether the Veteran's diabetes mellitus, type II aggravates his peripheral neuropathy and hypertension were provided. As the question of secondary service connection includes whether a service-connected disability aggravates other disorders, the Board concludes that the medical opinions are not adequate and do not comply with its prior remand directives. Therefore, a remand for an addendum medical opinion is required.

As for the issue of service connection for pericarditis, the Veteran was provided VA examinations in February 2007 and June 2011. However, no medical opinions were requested. Where VA provides the veteran with an examination in a service connection claim, the examination must be adequate. Barr v. Nicholson, 21 Vet. App. 303, 311 (2007). Without medical opinions being obtained, the Board concludes that these examinations are not adequate and a new examination is necessary. 

Turning to service connection for pulmonary sarcoidosis, a July 2011 letter from the Veteran's treatment provider confirms that diagnosis, reportedly an autoimmune disease, and also discusses the Veteran's exposure to asbestos during service. In light of the Veteran's reported exposure to asbestos, the Board finds that an examination would be beneficial to determine the etiology of the Veteran's pulmonary sarcoidosis. 

Since the issue of entitlement to SMC is inextricably intertwined with the remanded issues, the Board finds that it must also be remanded. 

Accordingly, the case is REMANDED for the following action:

(Please note, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). Expedited handling is requested.)

1. After obtaining the appropriate release of information forms where necessary, procure records of treatment that the Veteran has recently received. The Board is particularly interested in records of such treatment that the Veteran may have received from the Charleston and Columbia VA Medical Centers and from any other providers identified by the Veteran. If any such records identified by the Veteran are not available, he should be so informed, and notations as to the unavailability of such records and as to the attempts made to obtain the documents should be made in the claims file. All such available reports should be associated with the claims folder.

2. Obtain an addendum medical opinion from the March 2015 fee-based examiner (or, if unavailable, from a medical professional with appropriate expertise) to determine the etiology of the diagnosed neuropathy of the upper extremities and hypertension. The Veteran's claims file, including a copy of this remand, must be made available to the examiner for review in connection with the opinion. 

The examiner is requested to review the record and offer an opinion as to whether it is at least as likely as not (i.e., probability of approximately 50 percent) that the Veteran's peripheral neuropathy of the upper extremities and hypertension were caused or aggravated (permanently worsened beyond normal progression) by the service-connected diabetes mellitus, type II [If the peripheral neuropathy of the upper extremities and hypertension are found to have been aggravated by the service-connected diabetes mellitus, type II, the examiner should quantify the approximate degree of aggravation.] 

A complete rationale should be given for all opinions and conclusions expressed. 

3. Accord the Veteran appropriate VA examination(s) to determine the nature, extent, and etiology of any diagnosed pericarditis and pulmonary sarcoidosis. The Veteran's claims file, including a copy of this remand, must be made available to the examiner(s) for review in connection with the examination(s). 

The examiner(s) is requested to review the record and offer an opinion as to whether it is at least as likely as not (i.e., probability of approximately 50 percent) that any diagnosed pericarditis and/or sarcoidosis had their onset in service or are related to the Veteran's military service, to include asbestos exposure.

A complete rationale should be given for all opinions and conclusions expressed. 

4. Then, after ensuring that the requested examinations and opinions comply with the remand specifications, and after any further development deemed necessary, readjudicate the Veteran's claims. Please note that this case has been advanced on the Board's docket on account of the Veteran's health. If any benefit remains denied, the Veteran and his representative must be provided a Supplemental Statement of the Case, which includes a summary of any additional evidence submitted. The requisite period of time for a response should be afforded. The case should then be returned to the Board for further consideration.

The Veteran has the right to submit additional evidence and argument on these matters. Kutscherousky v. West, 12 Vet. App. 369 (1999). 

This appeal must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).


______________________________________________
A. C. MACKENZIE 
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs